SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

Index No.: 300732-2014
Date Purchased:

-------------------------------------------------------X

**SUMMONS**

LIONELL WILLIAMS,

Plaintiff designates Bronx
County as the place of trial.

Plaintiff(s),

- against -

The basis of venue is:
Plaintiff's Residence

THE CITY OF NEW YORK, COMMISSIONER
RAYMOND KELLY IN HIS OFFICIAL CAPACITY, P.O.
JOHN DOE #1, BADGE #: 25511, P.O. JANE DOE #2,
BADGE # 12414 AND BEST BUY,

Plaintiff resides at:
555 Kappock Street Apt. 8L
Bronx, NY 10463
County of BRONX

Defendant(s).

-------------------------------------------------------X

**To the above named Defendant:**

     **You are hereby summoned** to answer the complaint in this action, and to serve a copy
of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance
on the Plaintiff's attorneys within twenty days after the service of this summons, exclusive of the day
of service, where service is made by delivery upon you personally within the state, or, within 30 days
after completion of service where service is made in any other manner. In case of your failure to
appear or answer, judgment will be taken against you by default for the relief demanded in the
complaint.

Dated:     Bronx, New York
           February 7 , 2014

MICHAEL BRAVERMAN
GETZ & BRAVERMAN, P.C.
Attorneys for Plaintiff(s)
LIONELL WILLIAMS
172 East 161st Street
Bronx, New York 10451
(718) 993-3000
Our File No. 8703

TO:     **CORPORATION COUNSEL OF THE
        CITY OF NEW YORK**
        100 Church Street
        New York, New York 10007

        **COMMISSIONER RAYMOND KELLY
        IN HIS OFFICIAL CAPACITY**
        One Police Plaza
        New York, New York 10038

        **BEST BUY**
        1280 Lexington Avenue
        New York, NY 10028

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
-----------------------------------------------------------------X
LIONELL WILLIAMS,

                          Plaintiff(s),

                - against -

THE CITY OF NEW YORK, COMMISSIONER
RAYMOND KELLY IN HIS OFFICIAL CAPACITY, P.O,
JOHN DOE #1, BADGE #: 25511, P.O. JANE DOE #2,
BADGE # 12414 AND BEST BUY,

                    Defendant(s).

-----------------------------------------------------------------X

Index No.:
Date Purchased:

**VERIFIED COMPLAINT**

    **LIONELL WILLIAMS**, by his attorneys, **GETZ & BRAVERMAN, P.C.**, respectfully alleges as follows:

<u>AS AND FOR A FIRST CAUSE OF ACTION</u>

    (1)    At all times mentioned, Plaintiff **LIONELL WILLIAMS** was a resident of Bronx County, City and State of New York.

    (2)    At all times mentioned, Defendant **BEST BUY**, is a foreign corporation organized and existing under the laws of Minnesota, which owns and operated stores around the world and has a principal place of business in Minnesota and pursuant to law is capable of suing and being suite in this court.

    (3)    Defendant **BEST BUY** has a constitutional and statutory responsibility for the conditions a the Best Buy store located at 1280 Lexington Avenue, County of New York, State of New York and is responsible for ensuring that the operations of said business are in conformity with constitutional requisites.

    (4)    At all times mentioned, Defendant **CITY OF NEW YORK**, was and is a municipal corporation duly organized and existing by virtue of the Laws of the State of New York.

    (5)    On or about the 30th day of September 30, 2013 and within ninety (90) days after the claim herein arose, the Plaintiff served a Notice of Claim in writing sworn to on their behalf upon the Defendant **CITY OF NEW YORK**, by mailing certified mail return receipt requested a copy

thereof in duplicate to the officer designated to receive such process personally, which Notice of Claim advised the Defendant **CITY OF NEW YORK**, of the nature, place, time and manner in which the claim arose, the items of damage and injuries sustained so far as was then determinable.

(6)     At least thirty (30) days have elapsed since the service of the claim prior to the commencement of this action and adjustment of payment thereof has been neglected or refused, and this action has been commenced within one year and ninety (90) days after the happening of the event upon which the claims are based.

(7)     The Plaintiff has complied with the request of the municipal Defendant's for an oral examination pursuant to Section 50-H of the General Municipal Law and/or the Public Authorities Law and/or no such request was made within the applicable period.

(8)     Upon information and belief, at all times mentioned, Defendants **COMMISSIONER RAYMOND KELLY IN HIS OFFICIAL CAPACITY, P.O. JOHN DOE #1, BADGE #: 25511, P.O. JANE DOE #2, BADGE # 12414**, were and are police officers of the Defendant City of New York, and at all times herein were acting in such capacity as the agents, servants and employees of the Defendant, **THE CITY OF NEW YORK.**

(9)     On or about September 17, 2013, at approximately 4:30 p.m. within the Best Buy Store located within 1280 Lexington Avenue,, County of New York, State of New York the Defendants jointly and severally in their capacity as police officers, wrongfully touched, grabbed, handcuffed and seized the Plaintiff **LIONELL WILLIAMS**, in an excessive manner about his person, causing him physical pain and mental suffering. At no time did the Defendants have legal cause to grab, handcuff seize or touch the Plaintiff, nor did the Plaintiff consent to this illegal touching nor was it privileged by law.

3

### AS AND FOR A SECOND CAUSE OF ACTION

(10)    Plaintiffs repeats, reiterates and re-alleges all of the allegations contained in Paragraphs "1" through "9" with full force and effect as though set forth at length herein.

(11)    On or about September 17, 2013, at approximately 4:30 p.m. within the Best Buy Store located within 1280 Lexington Avenue, County of New York, State of New York the Defendants jointly and severally did place Plaintiff **LIONELL WILLIAMS** , in imminent fear of physical contact by approaching the Plaintiff with their loaded firearms, outstretched limbs and other objects which they used to physically seize, strike and restrain the Plaintiff. All of the above actions placed the Plaintiff in imminent fear of physical contact. At no time did the Plaintiff consent to the unlawful actions of the Defendants.

### AS AND FOR A THIRD CAUSE OF ACTION

(12)    Plaintiffs repeats, reiterates and re-alleges all of the allegations contained in Paragraphs "1" through "11" with full force and effect as though set forth at length herein.

(13)    On or about September 17, 2013, at approximately 4:30 p.m. within the Best Buy Store located within 1280 Lexington Avenue, County of New York, State of New York the Defendants, jointly and severally without any warrant, order or other legal process and without any legal right, wrongfully and unlawfully arrested the Plaintiff, restrained him and his liberty and detained him at the aforementioned store. The Defendants intentionally confined the Plaintiff without his consent and the confinement was not otherwise privileged by law and, at all times, the Plaintiff was conscious of his confinement.

### AS AND FOR A FOURTH CAUSE OF ACTION

(14)    Plaintiffs repeats, reiterates and re-alleges all of the allegations contained in Paragraphs "1" through "13" with full force and effect as though set forth at length herein.

(15)    On or about September 17, 2013, at approximately 4:30 p.m. within the Best Buy Store located within 1280 Lexington Avenue,  County of New York, State of New York the Defendants, jointly and severally without any valid warrant, order or other legal process and without any legal right, wrongfully and unlawfully imprisoned the Plaintiff, restrained him and his liberty and then took him into custody and causing him to be detained at the Best Buy Store. The Plaintiff was thereafter held in custody over the course of approximately ten (10) minutes hours before he was released. The Defendants intentionally confined the Plaintiff without his consent and the confinement was not otherwise privileged by law and at all times, the Plaintiff was conscious of his confinement.

### AS AND FOR A FIFTH CAUSE OF ACTION

**(This Cause of Action only applies against the Individually named Police Officers not the City of New York or officers sued in their official capacity)**

(16)    Plaintiffs repeats, reiterates and re-alleges all of the allegations contained in Paragraphs "1" through "15" with full force and effect as though set forth at length herein.

(17)    Defendants  , P.O. JOHN DOE #1, BADGE #: 25511, P.O. JANE DOE #2, BADGE # 12414 were at all times relevant, duly appointed and acting officers of the City of New York Police Department.

(18)    At all times mentioned herein, said police officers were acting under color of law, to wit: the statutes, ordinances, regulations, policies and customs and usage of the State of New York and/or City of New York.

(19)    Plaintiff LIONELL WILLIAMS is and at all times relevant herein, a citizen of the United States and a resident of Bronx County in the State of New York and brings this cause of action pursuant to 42 United States Code, Section 1983 and 42 United States Code, Section 1988.

(20)    The Defendant CITY OF NEW YORK is a municipality duly incorporated under the laws of the State of New York.

(21)    On or about September 17, 2013, the Defendants, armed police, while effectuating

5

the seizure of Plaintiff **LIONELL WILLIAMS**, did search, seize, assault and commit a battery and grab the person of the Plaintiff without a court authorized arrest or search warrant. They did physically seize the person of the Plaintiff during the arrest process in an unlawful and excessive manner. The Plaintiff was falsely arrested, unlawfully imprisoned and maliciously prosecuted without the Defendants possessing probable cause to do so.

(22)     The above action of the Defendants resulted in the Plaintiff being deprived of the following rights under the United States Constitution:

     a.    Freedom from assault to her person;

     b.    Freedom from battery to her person;

     c.    Freedom from illegal search and seizure;

     d.    Freedom from false arrest;

     e.    Freedom from malicious prosecution;

     f.    Freedom from the use of excessive force during the arrest process;

     g.    Freedom from unlawful imprisonment.

(23)     The Defendants subjected the Plaintiff to such deprivations, either in a malicious or reckless disregard of the Plaintiff's rights or with deliberate indifference to those rights under the fourth and fourteenth amendments of the United States Constitution.

(24)     The direct and proximate result of the Defendants' acts are that the Plaintiff has suffered severe and permanent injuries of a psychological nature. He was forced to endure pain and suffering, all to his detriment.

### AS AND FOR A SIXTH CAUSE OF ACTION

(25)     Plaintiffs repeats, reiterates and re-alleges all of the allegations contained in Paragraphs "1" through "25" with full force and effect as though set forth at length herein. (This Cause of Action applies to the City of New York and the officer sued in their official capacity should be characterized as a "Monell" claim.)

6

(26)    Defendant **CITY OF NEW YORK and COMMISSIONER RAYMOND KELLY IN HIS OFFICIAL CAPACITY,** has grossly failed to train and adequately supervise its police officers in the fundamental law of arrest, search and seizure especially when its police officers are not in possession of a court authorized arrest warrant and where an individual, especially as here, has not committed a crime and has not resisted arrest, that its police officers should only use reasonable force to effectuate an arrest and the arrest should be based on probable cause.

(27)    **THE CITY OF NEW YORK** was negligent by failing to implement a policy with its Police Department and instruct police officers who, absent the consent of the Plaintiff (or similarly situated individuals) or without the possession of a court authorized arrest and/or search warrant, said police officers of the City of New York are not to arrest individuals such as the Plaintiff here where probable cause is lacking and the use of force should only be reasonable when an individual resists arrest and should be used where a criminal defendant is not resisting arrest.

(28)    **THE CITY OF NEW YORK** is negligent due to its failure to implement a policy with its Police Department or actively enforce the law, if any of the following are lacking:

1.    Probable cause must be present before an individual such as the Plaintiff herein can be arrested.

2.    Excessive force cannot be used against an individual who does not physically resist arrest.

3.    An individual who sustains physical injury at the hands of the police during the arrest process should receive prompt medical attention.

4.    An individual such as the Plaintiff herein cannot be subjected to a strip search with cavity inspection unless the police possess legal cause and/or have a reasonable suspicion and/or probable cause that the plaintiff has secreted contraband in or on his person.

(29)    The foregoing acts, omissions and systemic failures are customs and policies of the **CITY OF NEW YORK** which caused the police officers to falsely arrest, maliciously prosecute,

7

seize illegally and search the Plaintiff commit an assault/battery to her person and denied her prompt medical attention under the belief that they would suffer no disciplinary actions for their failure to take proper or prudent steps in this case.

(30)   Defendant **CITY OF NEW YORK** was negligent in that prior to and at the time of the acts complained of herein, due to the prior history of the Police Officers Defendants, knew or should have known of the bad disposition of said Defendants or had knowledge of facts that would put a reasonably prudent employer on inquiry concerning their bad disposition and the fact that these officers were not suitable to be hired and employed by the **CITY OF NEW YORK** and that due to their lack of training, these officers should have had adequate supervision so that they would not arrest innocent individuals nor use excessive force during the arrest process.

(31)   The City of New York's failure to train its police officers to distinguish between individuals who are lessee's and/or reside at the apartment of sufficient length of time as evidenced by utility bills in their name, letters/mail addressed to them at the residence and/or magazine subscriptions, etc as opposed to individuals who are mere guests and/or visitors who do not have the right to exercise dominion and control over the residence as evidenced by their not having any furniture in the apartment, their name on the lease, their name on a utility bill or mail addressed to them are all factors that the City in the past has ignored. As these same fact patterns have come up over the past twenty-five (25) years with alarming frequency as evidenced by past notice of claims that the firm has filed with the City of New York in the past on multiple occasions sufficient to demonstrate a pattern by the City's police officers of continued violations of individuals similarly situated to the Plaintiff. The pattern demonstrates that either a defacto policy/custom exists to allow this behavior by failing to discipline its officers or this is a custom of its police officers who have no and/or sufficient training and/or no proper supervision and/or disciplinary penalties assessed against them for continued acting in an unconstitutional manner. The Plaintiff's counsel has approximately thirty-two (32) Notice of Claims spanning approximately 10 years to demonstrate a pattern practice and custom of deliberate indifference by the City. In the past, this represents at least

8

a de facto policy by the City of New York in countenancing unconstitutional behavior, by not disciplining and/or not properly supervising/training its individual police officers in the proper procedure of arresting or not arresting individuals who may be merely present at an apartment.

(32)    To demonstrate a de facto policy of unconstitutional dimension, one might only look at the stop and frisk program initiated by Commissioner Raymond Kelly, who has been NYPD Commissioner for over ten (10) years.

(33)    Upon information and belief, on or before May 17, 2012, the City and Kelly had instituted a highly aggressive "Stop and Frisk" program or policy that was carried out by its police officer employees, including the named defendants officers.

(34)    In the decade since Kelly has been appointed Police Commissioner, the number of reported annual "street stops" rose from 97,000 in 2002 to 684,330 times in 2011. Upon information and belief, said rise is due to the policies, directives and procedures implemented or approved by the "City" and/or "Kelly."

(35)    Upon information and belief, as part of its Stop and Frisk Program, the City, Kelly and the NYPD, provide multiple levels of training that covered Stop and Frisk procedures. That includes, but is not limited to, a workshop on Stop and Frisk, videos about the law of reasonable suspicion, patrol guidelines, Operational memorandum and ongoing training after graduating from the Police Academy.

(36)    Upon information and belief, this program, hereinafter referred to as "Stop and Frisk", disproportionately targeted minorities, males and/or youths for stop, question and/or frisks, resulting in the excessive use of force disproportionately against minorities, and violated the constitutional rights of citizens of New York City, including citizens residing within the confines of Bronx County.

(37)    In the matter of David Floyd et al. v. City of New York et al. 283 FRD 153, United States District Court, Southern District of New York, Justice Scheindlin, stated that "it is indisputable that the NYPD has an enormous stop and frisk program. There were 2.8 million

9

"documented" stops between 2004 and 2009. These stops were made pursuant to a policy that is designed, implemented and monitored by the NYPD administration" (Order Page 12).

(38)    Of the reported 1,121,470 stops, questions and frisks "reported" in 2008 and 2009 alone, 37% or 416,350 were for individuals between the ages of 14 and 21 (according to the 2010 census this age range represents only 10% of the City population). Thus, we submit that the defendant's stop and frisk policy thus heavily and disproportionately focused on youths of New York City, especially minority youths.

(39)    Statistical evidence further shows that pursuant to the NYPD stop and frisk policies and procedures, a great majority of civilians who were subjected to stop, question and/or frisk had not committed any crime, and that the NYPD engaged in said actions without reasonable suspicions of criminality. Furthermore, statistics show that blacks and Latinos were disproportionately targeted for stops, summons, arrests and excessive use of force.

(40)    Upon information and belief, it was statistically revealed that of the reported stops and frisks conducted by the NYPD between 2004 and 2009, officers' "suspicions" of criminality was wrong nearly 9 out of 10 times.

(41)    Upon information and belief, the City, NYPD and/or Kelly were long aware of the racial disparity of police stop and frisks. In 2007, the NYPD commissioned a study through The Rand Center on Quality Policing to study their stop, question and frisk patterns and practices. The study found that of the half a million persons stopped only 11% were Caucasians, 53% black and 21% Hispanic. Moreover, of the people that were stopped, 45% of Black and Hispanics that were stopped were frisked, while 29% of Caucasians that were stopped were frisked. Yet, when frisked, white suspects were 70% likelier than black suspects to have a weapon on them.  (Rand study analysis of racial disparity in the New York Police Department Stop, Question and Frisk Practices, page xi).

(42)    The Rand report found that black pedestrians were stopped at a rate 50% greater than their representation in the residential census. RAND report page xi. The Rand report made several

10

recommendations to the NYPD to "improve interactions between police and pedestrians during stops and to improve the accuracy of the data collected during pedestrians stops" (Rand page xv). Some of the many recommendations proposed include: review boroughs with the largest racial disparities in stop outcomes; record the reason(s) that the need to use force was used; monitor radio communications to make sure stop and frisk forms are being filled out; and identify, flag and investigate officers with out of the ordinary stop patterns. Finally, the report found "some correction in training during new officers' initial days on the street might be in order, particularly for any evaluation of Operation Impact practices" (Rand page xvi).

(43)    Upon information and belief, the defendants did not adopt these suggestions, and as of September 17, 2013, still continued to stop, frisk, search and use force on minorities in a disproportionate manner and target their stop and frisk policies in predominately non-white precincts within the City of New York.

(44)    Upon information and belief, police officers routinely engage in "stops" and then attempt to justify the stop and/or frisk, when in fact the basis for the stop or stop and frisk was pretextual and/or discriminatory in nature. Upon information and belief, frisks and/or searches are conducted without justifiable reasons.

(45)    According to a statistical analysis conducted by Colombia University Professor Jeffrey Fagan, submitted in the Floyd case, police cited (as a reason for stop and frisk) a "suspicious bulge" in 10.4% of all stops, yet a gun was found in 15% of all stops (or 1 out of every 69 persons stopped on suspicion of concealing a weapon). Furtive movements were cited as a reason in more than 50% of all stops.

(46)    Professor Fagan also statistically found that "NYPD stop and frisks are significantly more frequent for Black and Hispanics residents than they are for White residents, even when adjusting for local crime rates, racial composition of the local population....." Floyd at 29. He further statistically found that when stopped Blacks and Latinos are treated more harshly than Whites

11

stopped on suspicion for similiar criminal activity. The term Black, White and Latinos are included within the NYPD reports and are adopted herein.

(47)    Analyzed date of the Stop and Frisk Program revealed in a report released by the Center for Constitutional Rights in 2012 found:

1.    Analysis of the information recorded by police officers themselves in their stop and frisk reports indicates that more than 95,000 stops lacked reasonable, articulable suspicion and this violated the Fourth Amendment.

2.    The NYPD continues to frequently and indiscriminately use the highly subjective and constitutionally questionable categories of "high crime area" and "furtive movements". "High crime area" is checked off in more than 60% of all stops. A comparison of actual crime rates to the claim that a stop was in a "high crime area" reveals that this factor was cited roughly the same rate regardless of the crime rate. "Furtive movement" was also checked in a majority of stops, 53% of them. Here, too, there was no correlation between the frequency of this stated reason for a stop and actual crime rates. Both the frequency of these classifications and their complete absence of any relationship to actual crime rates suggest strongly that they are not legitimate indicators or reasonable, articulable suspicion.

3.    Only 6% of stops result in arrest, an extraordinarily small number given that stops are legally supposed to be based on reasonable, articulable suspicion. The rates of seizure of weapons or contraband are minuscule .12% of stops yield gun seizures and 1.8% contraband - and are lower than the seizure rates of random stops.

(48)    Sine 2009 the number of Stop and Frisks has dramatically risen. In 2010, there were a reported 601,055 stops.

12

(49)   For the calendar year 2011, New York City precincts reported 685,724 "stops." Of that total number 350,743 were categorized as stops of persons of black descent and 223,650 were of Latino descent (this does not include the number of individuals who were not categorized and who may be of a black or Latino descent). Thus, 83.7% of individuals stopped were categorized as "minorities." Of the 381,704 person frisked in 2011, 330,638 (89.2%) were black and Latinos and 27,341 (7.4%) were whites.

(50)   According to a 2010 census, blacks make up 25% of the City's population, Latinos 29% and whites 33%.

(51)   Statistical data also revealed the stop and frisk practices, when measured against the composition of the precinct population, was employed at a much greater frequency in precincts whose population was composed predominantly of minorities. In 2011, the 73rd, 23rd, 81st, 41st and 25th precincts (Brownsville, East Harlem South, Bed Stuyvessant East, Hunts Point and East Harlem North) stopped 29.1%, 23.9%, 21.8%, 21.7% and 20.9% of their populations respectively. Meanwhile, in the Upper East Side (19th Pct.), Bensonhurst (62nd Pct.), Bay Ridge (68th Pct.), Totenville (123rd Pct.) and Borough Park (66th Pct.), each predominantly white precincts, residents were stopped at a rate of 2.5%, 2.4%, 2.3%, 2.1% and 2.0% of their populations. The same pattern hold true when the stops resulted in frisks. The top 5 precincts reporting the most number of frisks were minority populated precincts, such as the 75th, 73rd, 44th, 115th and 40th, while the least amount of frisks were conducted in white populated precincts such as the 94th, 18th, 123rd, and 22nd.

(52)   Even in traditionally white neighborhoods, such as the 17th pct. (East Side, Manhattan), black and Latino residents are stopped at a disproportionate rate when compared to its white citizens who reside within the same pct. To illustrate the point, in 2011, 71.4% of all stops made in Kipps Bay/Murray Hill, NY, were made against blacks and Latinos. Yet, they account for only 7.8% of the total precinct population. In Greenwich Village, where blacks and Latinos comprise only 8% of the precinct, they accounted for 76.6% of all stops. (New York Civil Liberties Union

13

Stop and Frisk 2011 Report) The same reports also cites the additional precincts engaging in the same practice: 19th, 123rd, 1st, 61st, 11th, 20th, 13th and 62nd.

(53) It was further reported that at least one act of force was used in 148,079 "stops" (or in 21.5% of the total number of stops in 2011), with 76,483 reported the use of force against blacks, (21.8% of all stops of the 350,743 stops made against them in 2011). It should be noted that 51.7% of all "reported' instances of use of force by New York City Police were made against persons that the NYPD categorized as "black". In 2011, blacks and Latinos had force used against them 129,590 times as compared to white, 9,765 times.

(54) To illustrate the prevalence of the use of force within the context of the "Stop and Frisk" program, it should be noted that the number of stops in which at least one act of force was "reported" as being used (148,079 times) exceeded the total number of summons (41,215) and arrests (40,883) made from reported "stops" in New York City in 2011 (total 82,098). Thus, it was 1.8 more times likely that force was used by police during a stop and frisk encounter than it was that said encounter resulted in an arrest or a summons being issued.

(55) Upon information and belief, the City and Kelly and/or NYPD, either condoned the use of stop and frisk program, or the use of force in conjunction with it, as "means to an end", or acted with deliberate indifference to the knowledge that it was being utilized in that manner in a vast number of cases where there was no reasonable suspicion or no evidence of any criminality that would justify the use of any force, or force to the degree it was used, much less the initial stop and frisk.

(56) The City, and/or Kelly sought to justify the tremendous increase in the stop and frisk program by claiming that the program helped rid the City of illegal guns. Yet, that contention or rationale is not statistically borne out. Nor would it serve as justification to violated the laws of the United States Constitution of the State of New York. In 2003, the NYPD conducted 160,851 stops and recovered 604 guns. In 2011, the NYPD conducted 685,724 stops, or an additional 524,873 stops

14

when measured against 2003 statistics. Yet they only recovered an extra 176 more illegal guns as, or a total of 780. That computes to a .0003% success rate for the additional stops made.

(57)     Upon information and belief, the City and/or Kelly acted with deliberate indifference to statistical evidence that enforcement or application of the "Stop and Frisk" program was highly unlikely to result in an arrest, a summons or the recovery of weapons or contraband. (Weapons were recovered in 1.14% of the total number of stops reported in 2011.)

(58)     In fact, the City and/or Kelly were deliberately indifferent to statistical evidence / reports/information/complaints and other information that they possessed that indicated that: the stop and frisk program was targeting minorities, targeting minority communities or precincts; evidence that the stop and frisk program was racially biased; the program was targeting youths; officers were using force, including unnecessary or excessive force on carrying out this program; the program was being unconstitutionally applied; the training police officers received was inadequate, and that there was a need for proper training in the academy, for supplemental training in service, and for in-field supervision and training in the laws of the 4th Amendment, the legal use of force, for reasonable suspicion and general police guidelines and search and seizure laws and parameters.

(59)     Upon information and belief, the City and/or Kelly, acted with deliberate indifference that the aforementioned issues would, could and did result in the countless violations of constitutional rights of its citizenry.

(60)     Upon information and belief, prior to May 17, 2012, the City and/or Kelly, failed to require that precinct commanders audit each officer worksheets, and failed to maintain or develop a system or methodology for identifying and tracking police officers who receive a baseline number of civilian complaints related to improper stops, improper frisks or searches, unnecessary or excessive use of force, threats, illegal entry into citizen's home and/or discourtesy.

(61)     The stop and frisk program especially targeted minority youths in the 14-24 age range.

15

(62)   Although Blacks and Latinos males between the ages of 14 and 24 account for only 4.7% of the City's population, they accounted for 41.6% of all stops in 2011. White youths in the same age group account for 2% of the City's population and were responsible for only 3.8% of the total number of stops. In 2011, young black men between the ages of 14 and 24 were "reported" being stopped 168,126 times, which exceeded the total number of young black men in this age range who reside in New York City (158,406).

(63)   Minority youths were particularly vulnerable not only to stops, or stop and frisks, but more alarmingly to the use of force by the NYPD. As reported in Growing Up Police in the Age of Aggressive Police Policies, by Brett G. Stoudt, Michelle Fine and Madeline Foz, in New York Law School Review, Volume 56, 2011/12, youths who were stopped during the two year period of 2008-2009 were frisked 61.3% of the time, they were arrested 5.4% of the time, issued summons 5.1% of the time and weapons were found on the youths 1.2% of the time (most if the weapons recovered were knives, guns comprised only 17% of the total weapons recovered). Yet, it was reported that force was used against the same youths 26.3% of the time, or approximately 2 ½ times more than the likelihood of being arrested or issued a summons. It was also found that reports of youths carrying a suspicious bulge or object, actions indicative of engaging in a violent crime, or an object in plain view 10.5%, 9.6% and 1.7% respectively, were highly unreliable and unlikely to lead to the recovery of an illicit gun. The total number reported (using the aforementioned criteria) of stop and frisks of youths were 90,756, yet the total illegal guns recovered (under any basis or criteria for reasonable suspicion) was 831 during that period, or .009%.

(64)   In all, 416,350 youths (381,578 or 91.6% were males and 218,260 of the total youths stopped (52.4%) were categorized as black or African American) were stopped during the 2008-2009 and 405,898 (97.5%) of them were free of weapons or contraband. Only 10% of the total youths stopped were white youths and only 7% female from 2008-2009.

(65)   Upon information and belief, the "stop and frisk" program: targeted or was applied, in a discriminatory manner against minorities; was applied or enforced in predominately minority

16

communities; was age biased against youths, age 14-24; and was gender biased (against males) as well.

(66)     These youths were also subjected to the unnecessary use of force. Stodt, Fine and Fox further reported that of the 109,499 times that force was used against youths in 2008 and 2009, the police in 2,142 instances, (more than twice the number of times that any weapon was recovered) drew their firearm and/or pointed their firearm at a suspect. In the other 107,357 cases where force was reportedly used, it included hands on suspect, placing the suspect on the ground or against a wall/car, the use of a baton or pepper spray among other things.

(67)     The racial, gender and age disparity of these statistics could not and should not have been ignored.

(68)     · Upon information and belief, the NYPD issued a Department Operations Order in 2002 prohibiting racial profiling. Nevertheless, upon information and belief, racial profiling continued to be utilized as a policing tool of the NYPD as of May 17, 2012. Moreover, there was no Operations Order or directive prohibiting any type of gender or age bias application of policing practices in place on that date.

(69)     Police Commissioner Kelly has stated that the Stop and Frisk Program, and the "stops" thereunder, serve as a deterrent to criminal activity, which includes the criminal possession of a weapon. Therefore, he endorsed, and upon information and belief, continues to endorse said program and have it applied by the police officers under his command, although said program was being used to stop and stop and frisk citizens without reasonable suspicion, and in a racially biased manner.

(70)     Upon information and belief, this Stop and Frisk program was in effect on May 17, 2012 and was trained, implemented and overseen throughout the City of New York and all precincts therein, including the 42nd Precinct by P.O. Robert Collazzo and P.O. Adrian Uruci.

(71)     What the aforementioned statistics were compiles for all New York City Precincts, the statistics are particularly alarming for the Bronx, where the incident occurred.

17

(72)   At all relevant times hereunder, the Bronx Patrol Boro, under the command of Deputy Inspector Steven Ortiz was a particularly aggressive precinct, in arresting individuals.

(73)   The most common reason used by the NYPD to justify stopping civilians of New York City, almost 90% of whom had committed no crime or violation, falls predominantly within the category "furtive movements." In 2011, that reason was given in 51.3% of the total number of stops.

(74)   However upon information and belief, the City and/or Kelly, either failed to train officers what constitutes "furtive movements", or acted with deliberate indifference to the need enhance or supplement training in the area; they acted with deliberate indifference to the unequal application of stop and frisk procedures when "furtive movements" are committed by "whites", not resulting in "stops", while the same movements when committed by minorities resulted in "stops"; and they acted deliberate indifference to the knowledge that "furtive movements" was not a statistically reliable marker of possession of contraband, weapon, or that a person has committed, or is about to commit a crime. In sum, "furtive movements" has been statistically proven to the unreliable to establish reasonable suspicion to justify a stop, or a stop, question and frisk.

(75)   The aforementioned statistical proof shows that said reasons or rationale for said stops were inaccurate, unreliable, untrue or without statistical probability of success.

(76)   Further evidence of the defendants' over aggressive stop and frisk policies which targeted minority communities, such as the Wakefield section of the Bronx, can be found in the Trespass Affidavit Program, formerly known as Operation Clean Halls. In Ligon v. City of New York, No. 12, Civ 2274, plaintiff brought an action alleging that the NYPD's trespass stops outside TAP buildings are often without reasonable suspicion, violating the 4th Amendment rights. Justice Scheinldin in a written decision filed January 8, 2013, agreed.

(77)   In her decision, Justice Scheindlin stated "while it may be difficult to say where,

18

precisely to draw the line between a constitutional and unconstitutional police encounter, such a line exists, and the NYPD has systematically crossed it while making trespass stops outside TAP buildings in the Bronx." (Ligon page 10)

(78)    Although Bronx District Attorney Jeanette Rucker sent memos to NYPD Police\ Commanders and police officials expressing her concerns of the reasons police were providing for stopping innocent individuals outside Clean Hall building, her concerns were unheeded.

(79)    Dr. Fagan concluded that 63% of "the recorded trespass stops outside the Clean Halls building in the Bronx in 2011, where no indoor behavior was observed, were not based on any articulated reasonable suspicion." (Ligon at 67)

(80)    Although Olyn Phin's case does not involve a Clean Halls Building or fall within the TAP program, it does fall within the umbrella of the defendants' over aggressive policing policies directed at minorities and at minority communities, and their failure to adequately train and supervise its officers in the laws and parameters set by the 4th Amendment. The actions taken by the officers on May 17, 2012 as will set forth herein, resulting in Olyn Phin's constitutional violations, stems in large measure, from the policies, customs and procedures set by the defendants, including the stop and frisk program, the inadequate training and supervision of, and by its officers and/or the pressures exerted by the City, NYPD Ortiz and/or Kelly to meet performance standards measured by the number of arrests made and summons issued.

(81)    Upon information and belief, said Stop and Frisk program was established, maintained, supervised, continued, applied and monitored to meet arrest/summons, numbers/quotas and to establish and/or meet performance standards.

(82)    Upon information and belief, the NYPD, City and/or Kelly established performance standards which demanded, or resulted in increased levels of stops and frisks.

(83)    According to the 10/17/11 Police Officer Performance Objectives Operation Order, Commissioner Kelly directed all commands that "Department managers can and must set

19

performance goals" relating to the "issuance of summons, the stopping and questioning of suspicious individuals, and the arrests of criminals."

(84)    The same Operation Order stated "uniformed members....Who do not demonstrate activities...or who fail to engage in proactive activities...will be evaluated accordingly and their assignments re-assessed."

(85)    In the Floyd case, Justice Scheindlin cited evidence of a quota system which included a minimum number of monthly "stops." Said evidence includes:

1)    the deposition of Inspector Dwayne Montgomery, Commander of the 28th Precinct, who testified that he expected his officers to conduct a minimum of 2.3 stops and frisks per month and used that number "as a way of just gauging whether or not they were doing their job." Floyd at 20.

2)    Police Officer Adhyl Polanco of the 41st Precinct testified that his commanding officers announced specific quotas for arrests and summons. He further testified that officers were threatened with reduced overtime or reassigned for failure to meet quotas.

3)    Police Officer Adrian Schoolcraft recorded all roll calls at the 81st Precinct where supervisors were yelling and instructing officers to conduct unlawful stops and arrests to meet higher performance numbers. This order was coming down "the chain of command." The statements were made by Lt. Delafuentes, Deputy Inspector Mauriello and Sgt. Stukes and cites the instructions of Chief of the Transportation Bureau of the City of New York Police Department, Michael Scagnelli.

4)    Police Officer Luis Pichardo of the 28th Precinct offered testimony that his supervisors imposed a five summons per tour quota.

(86)    In a recent decision by Judge Shira Scheindlin, she ruled in a related case, Ligon v. The City of New York, that the NYPD has systematically crossed the line when making trespass stops outside TAP (trespass affidavit program) building in the Bronx.

(87)    In reviewing the evidence in the Ligon case, Justice Scheindlin reached the conclusion that the "NYPD's inaccurate training has taught officers the following lesson: stop and question first, develop reasonable suspicion later."

(88)    The aforementioned pattern of illegality demonstrates a pervasive pattern if unconstitutional behavior that permeates the City of New York Police Department, as individual police officers are pressured to "make the numbers" each month.

(89)    Upon information and belief, officers who issue a high number of summons, conduct a large number of "stop and frisks", and/or make or meet a minimum number of arrests, will receive a good performance rating, resulting in four career path points on an annual basis. Upon information and belief, said points will ultimately be used or applied towards a "fast track" career path for advancement.

(90)    Upon information and belief, in order to meet the activity quotas the SNEU team developed a system of "next up." Upon information and belief, the defendants engaged in a system or practice wherein officers would rotate arrests and who would catch them. That way all members of the "team" would meet their numbers, regardless of the training of the officer or his/her qualification and capability to be "next up" in the unfolding circumstances of the case. Upon information and belief, the performance system and lack of any meaningful evaluation resulted in shortcuts taken by NYPD officers, constitutional violations of citizens, false arrests and illegal search and seizures. Yet, the City acted with deliberate indifference to the constitutional violations that their officers were engaged in, and the complaint of its residents, citizens of the City of New York. The facts of this case further demonstrate that the "NYPD" encourages illegal arrests by turning a blind eye to the facts and arresting individuals who are merely present at a crime scene.

21

(91)   The City and/or Kelly were aware that the NYPD customs, policies and procedures, as well as their deliberate indifference to the unconstitutional applications of their customs, policies and procedures, and need for reformation of its training, oversight, analysis, supervision, monitoring, disciplining and review would lead to constitutional violations of its citizenry and did lead to said violations of the plaintiff's constitutional rights.

    A.    In the case of Ligon v. City of New York, Raymond W. Kelly et al. Justice Scheindlin's Opinion and Order filed 1/8/13 noted that the police training in laws of search and seizure are wrong. She cites as an example of inadequate training a Police Training Video (no. 5) which she stated incorrectly advised police officers what constituted a "stop", and whether force, or the threat of force must accompany the police action to constitute a "stop."

    B.    In Ligon, Justice Scheindlin found fault in the police training video which made incorrect distinctions between "stops" and "arrests." In her decision she writes, "By incorrectly implying that the encounters lacking the characteristics of an *arrest* are in fact not even *stops*, the video appears to train officers that they do not need reasonable suspicion to perform the kinds of stops that an accurate reading of the law would be classified as Terry stops. In other words, this video,....trains officers that it is acceptable to perform stops...or possibly even arrests without reasonable suspicion," (pages 126, 127).

    C.    Justice Scheindlin further found that "the evidence of numerous unlawful stops at the hearing strengthens the conclusion that the NYPD's inaccurate training has taught officers the following lessons: stop and question first, develop reasonable suspicion later," (Ligon at 131).

(92)   The defendants' deliberate indifference is further evident by and through the lack of meaningful investigation and punishment of transgressors. Upon information and belief, the NYPD

22

Internal Affairs Bureau, "IAB", investigations rarely lead to administrative trials, and when they do, and the charges are somehow sustained, the punishment is minimal, thereby lacking any deterrent effect.

(93)    Upon information and belief, officers operated with the tacit approval of their supervisors and up the ranks, with an "ends justifying the means" mentality. This mentality includes a custom or practice of stopping, or stopping and frisking first, then establishing reasonable suspicion after the fact. Use of force was viewed as collateral damage of the stop and frisk policy established by the NYPD.

(94)    Police Officers were rarely, if ever brought up on charges, investigated or disciplined for their over aggressive application of stop and frisk policies and practices, including pursuits into homes, use of force or discharge of their weapons.

(95)    Precinct commanders and supervisors were rarely, if ever, investigated, disciplined, reassigned or retained due to their own observations of misconduct, review of data or complaints from citizens for excessive use of force, 4th Amendment violations, illegal search and seizure, illegal entry into citizens' homes without a warrant, false arrests, witness intimidation, submitting false police reports and other constitutional rights violations occurring in their command, under their watch. In fact Procedural Code for Police Supervisors (for the NYPD) sets forth certain protections for police officers and restrictions placed on supervisors, all at the expense of the general public. They include:

        A.    PG 205-46 which states that records of officers who engage in counseling services will not have any records duplicated or forwarded anywhere within the NYPD;

        B.    If a supervisor officially refers a member of service for counseling, in non disciplinary cases, no report will be generated, no record of the referral will be noted in the member's personnel file and supervisors will only be advised

23

as to the level of cooperation of the officer on a need to know basis (PG 205-46);

C.   Officers who participate in counseling services will not jeopardize assignments. Assignments will not be changed...unless a change is deemed appropriate for all parties.

(96)   Thus, the City acted with deliberate indifference to the need to reform their customs and practices which included as stated herein rampant examples of constitutional violations of its citizenry, thereby lending tacit approval to the unconstitutional conduct. Upon information and belief, the City, Kelly and/or the named defendants herein, were more interested in meeting "numbers" than they were safeguarding the constitutional rights of its citizens.

(97)   Other instances of racial bias or profiling: an illegal and/or improper stop and frisk program, custom, practices or policy, the appellation of and tolerance of excessive use of force; polic cover-ups which include filing false charges and intimidating witnesses to said misconduct; and warrantless entry into citizen's homes are:

a.   On November 11, 2007 at 3:00 a.m. Antoine Parsley, an African American make, was walking in the vicinity of 123rd Street and 2nd Avenue in New York, when he observed officers from the 25th Precinct chasing two unknown individuals. One of the officers came to up Parsley and grabbed him, punched him in the mouth and handcuffed him while being surrounded by other officers. Parsley was never informed as to why he was being arrested and when he asked he was told to "shut the fuck up." Parsley was transported to the precinct, searched and stripped of all his belongings. When Parsley's cousin came into the precinct to check on him, he too was arrested and put in the same holding cell. Officers later came into the holding cell, held Parsley down on a bench and punched him repeatedly. They proceeded to choke him while he was handcuffed to the bench. Parsley was falsely charged with obstruction of governmental administration, which was later dismissed. Upon

24

information and belief, no investigation or disciplinary action was taken against the police officers.

b.  On October 2, 2010, Darin Montague, an African American male, was lawfully crossing a street when officers from the 52nd Precinct approached him and asked if he had any drugs on him. The officers proceeded to frisk Mr. Montague and despite not finding any contraband, they handcuffed and arrested him. Later at the precinct they made him strip naked of all clothing, bend over and cough. He was illegally detained and imprisoned for hours, without filing any charges against him. Upon information and belief, no investigations or disciplinary action was taken against the police officers.

c.  On November 6, 2010 at 2:00 a.m. Jermel Palmer, a young African American male, was inside the lobby of his building located at 425 East 105th Street, New York, New York, when an officer from the 23rd Precinct approached him, ordered him to turn around, and searched him without just and proper cause. Not finding any contraband, the officer let Mr. Palmer go, only to stop him before he was allowed to continue upstairs in the elevator. When Palmer objected to the officer's conduct, he was forcefully pulled out of the elevator, repeatedly punched him in the face, repeatedly slammed into walls, the floor, the police vehicle and punched him in the ribs, all while handcuffed. The officers, a sergeant, falsely charged Mr. Palmer with attempted assault, resisting arrest and harassment. All criminal charges were later dismissed. Palmer sustained injuries to his right shoulder, wrist, knees, elbows, gums, jaw and was required to get a steroid injection. Upon information and belief, no investigations or disciplinary action was taken against the police officers.

d.  On November 8, 2010 at 1:30 a.m., Amin Torres was exiting his friend's apartment located at 1304 Merriam Avenue in the Bronx, when an officer

from the 44th Precinct ordered him to stop and get against a wall. The officer began to search him without just or probable cause. Upon searching Torres, the officer found a small but legal knife. He forcefully pushed Torres against the wall, handcuffed him and threw him to the ground. Torres was taken to the precinct, continuously called derogatory names and searched a second time. He was falsely charged with possession of a weapon in the fourth degree, The charge was later dismissed. Candida Stark, the person whose home Torres was visiting, witnessed and objected to the police treatment of Torres, She was assaulted by the police, threatened and pushed her back inside her building. Stark suffered multiple contusions of the face and leg and severe pain to the right eye. Upon information and belief, no investigations or disciplinary action was taken against the police officers.

e.  On July 9, 2008 at 10:15 p.m. June and Bridget Pressley, two young African American females, were at their residence when officers of the 81st precinct approached June. They asked her for identification without having any justifiable reason for doing so. June went inside the apartment to retrieve her ID. The officer, without a warrant, and without probable cause or reasonable suspicion, forcibly entered the apartment behind her. June was pushed and thrown about the apartment and into her television. While on the floor, she was repeatedly struck with a nightstick. The officers struck her sister Bridgett who was pregnant at the time. Both individuals were falsely charged with obstructing governmental administration, resisting arrest, disorderly conduct and harassment, which were later dismissed. Although numerous officers were present not one interceded or reported the misconduct. The civil lawsuit was settled. Upon information and belief, no investigations or disciplinary action was taken against the police officers.

26

f.      On August 3, 2007 at 1:00 a.m., Maquan Moore, a young African American
        male was stopped without just or probable cause by officers from the 25th
        precinct. He was grabbed, pulled of his bicycle, thrown against one of the
        unmarked cars, searched and placed in handcuffs. While being searched,
        officers pulled down his pants, shined a flashlight in the front and back of his
        boxers, all outside in the presence of Maquan's friends. The officers
        threatened Maquan repeatedly, dragged him and threw him in the back of the
        unmarked car and slammed down on his leg.  An officer made Maquan
        submit to a strip search again at the precinct and then dropped Maquan back
        at the scene without pressing charges against him. Upon information and
        belief, no investigations or disciplinary action was taken against the police
        officers.

g.      On September 27, 2007 at 11:00 p.m., David Franklin, a young African
        American male, was walking home from night classes when he was stopped
        and illegally searched without just or probable cause.  Officers from the 47th
        precinct forcefully twisted his arm behind his back, forced him to the ground,
        struck Franklin and placed a knee in his back.  Franklin was handcuffed,
        arrested, imprisoned and falsely charged with Disorderly Conduct which was
        later dismissed. Upon information and belief, no investigations or
        disciplinary action was taken against the police officers.

h.      On January 5, 2010 at 8:00 p.m., Ilan Gomez, Edwardo Rivera, Jonathan
        Baez and Javier Tavarez, were all in the vicinity outside of 2473 Davidson
        Avenue, in the Bronx when an undercover officer from the 52nd Precinct
        came up to them and asked if they knew where to buy some weed. Baez told
        the undercover to go away. A few minutes later, an unmarked police van
        pulled up on the street and officers ordered Baez, Gomez, Rivera and Tavarez

27

to get on the ground. At the same time, Louis Miranda was returning to his father's and uncle's home. Police officers, absent probable cause or reasonable suspicion, chased Miranda and attempted and broke down the door of the home. They pulled the door open and shot Jamie and Hector Miranda's pit bull. They grabbed Louis, Hector and Jamie Miranda and beat them up, taking Hector and Jamie into the street in their underwear. Officers slammed Gomez into the sidewalk, Tavarez was kicked, had a knee placed in his back and assaulted on the sidewalk; Baez was punched in the face numerous times, slammed into the sidewalk numerous times, struck about the body and had his foot and ankle stepped on. The brutality was caught on video. Supervisors were present and failed to take any action. No disciplinary report was filed by any supervisors present and not one officer intervened to stop the abuse from happening. Instead the officers conspired to file false criminal charges against all individuals which were later dismissed. Two officers were later arrested, prosecuted and upon information and belief convicted and two sergeants suspended, once evidence of the video came out. However, upon information and belief, no investigations or disciplinary action was taken against the other police officers present.

i.    On January 20, 2010 at 6:00 p.m., Justin Hawkins, Demond Ingram and Akeem Huggins, each young African American males, were lawfully walking down a street, a few blocks from their homes in Staten Island, when officers from the 120th precinct approached and grabbed Justin and pushed him into a nearby gate. Justin was searched without reasonable suspicion, thrown to the ground, hit with a cell phone, handcuffed and transported to the precinct. Desmond was pushed into nearby gate, thrown onto the hood of a car, punched in the face, struck with police equipment, punched multiple times

while handcuffed, stepped on and kicked repeatedly in the face. Scott Hawkins, Justin's father, heard that there was an incident regarding his son, so he stepped outside to obtain information from the officers. He was assaulted, in that he was jumped from behind, maced, choked to the floor, kicked, kneed, struck with a baton and arrested. Desmond and Akeem were falsely charged with harassment, felony assault, resisting arrest and disorderly conduct. Justin and Scott were falsely charged with harassment, petty larceny, possession of stole property, felony assault and disorderly conduct. All criminal charges were dismissed against all individuals. They all sustained physical injuries at the hands of the police. Although many officers were present during the assault, not one reported it and upon information and belief there was no meaningful investigation undertaken by the police department into the misconduct and no officers faced any disciplinary charges.

j.      On August 13, 2008 at 1:00 p.m., Robert Melendez was at his car which was parked on the corner of Lafayette Avenue and Rosedale Avenue in the Bronx, when he observed officers from the 41st precinct forcefully arresting an unknown man. Melendez needed to leave for work, but couldn't because the officers were searching the gentleman's property on the trunk of his car. Melendez told the officers he was a bus operator and needed to leave. One of the officers became annoyed and accused Melendez of "smoking" and the other officer ordered Melendez to be arrested. Melendez sat handcuffed in a police van for more than two hours, was held overnight, falsely charged with criminal possession of marijuana and unlawful possession of marijuana. Both charges were dismissed on October 21, 2008. Upon information and belief, no investigations or disciplinary action was taken against the police officers.

29

k.    On February 6, 2010 at 10:30 p.m., Daniel Perez was lawfully a guest in the
lobby of a building at 365 Fountain Avenue in Brooklyn when two officers
from the 75th precinct entered and proceeded to chase Daniel without just
cause or reasonable suspicion.  As Daniel exited the building, one officer
tackled him to the ground, slammed his head onto the cement sidewalk,
handcuffed him and when Daniel was picked up, the second officer kneed
him in the ribs, making Daniel fall to the ground a second time.  The officers
threatened and called Daniel derogatory names and he was transported and
searched at the precinct. Daniel was falsely charged with criminal trespass in
the third degree, which was later dismissed. He sustained multiple fractures
to the face. Upon information and belief, no investigations or disciplinary
action was taken against the police officers.

l.    On August 7, 2010 at 2:30 p.m., Lorraine Sinclair, a young African American
woman, was stopped by two officers of the 41st precinct as they drove by in
their patrol car. When she provided her ID, the officers claimed that Lorraine
had an open warrant, proceeded to get out of the vehicle, grab Lorraine,
pushed her to the ground, slammed her face into the floor, knocked her
unconscious and handcuffed her. Lorraine was falsely charged with resisting
arrest, harassment and criminal mischief. All charges against her were
dismissed. Sinclair suffered from deep lacerations to the back and shoulder
which resulted in scarring and deep bruising. Although many officers were
present during the assault, not one reported it. Upon information and belief,
no investigations or disciplinary action was taken against the police officers.

m.    On February 15, 2009 at 6:45 p.m., Eliet Harrell, an African American male,
was a passenger in a vehicle which was lawfully parked in the vicinity of 818

30

Home Street in the Bronx when officers of the 42nd precinct walked up to the car, knew someone named "Tony." Upon reply, the officers ordered everyone to step out of the vehicle and the car was searched. As Mr. Harrell was told to go to the back of the car, along with two other individuals, an officer began to use abusive language towards everyone who was in the car. Mr. Harrell was frisked, handcuffed, punched in the face, grabbed and tripped, struck continuously on the ground by multiple officers with fists, feet, batons and radios. Mr. Harrell was falsely charged with felon assault, misdemeanor assault, resisting arrest, obstruction of governmental administration, criminal possession of marijuana, unlawful possession of marijuana, harassment and disorderly conduct. He was found not guilty of all charges at trial. Harrell sustained multiple fractures and spinal injury due to the assault. Although many officers were present during the assault, including a sergeant, not one intervened or reported it. Upon information and belief, no investigations or disciplinary action was taken against the police officers.

n.  On January 17, 2008 at 9:05 p.m., Vasaan Burris, a young African American male, was lawfully walking on 42nd Street in New York County when officer of the 14th precinct tackled him from behind, knocked him to the ground, put a knee in his back and handcuffed him. Burris was brought to a nearby vestibule where he was thrown against a wall, searched and taken to the precinct. The officers ordered Burris to remove all his clothing and he was searched a second time, including a cavity search and was released without having any knowledge as to why he was arrested. He was not charged with any crime. Upon information and belief, no investigations or disciplinary action was taken against the police officers.

31

(98)    The acts of the police officers who violate the civil and constitutional rights of the citizens of New York routinely go unreported by fellow police officers, not investigated by their superior officers and consequently their acts, actions, omissions go unpunished. Failure to intervene and report is the norm, not the exception. In none of the cases cited in paragraph 100 a-n above did the police officers intervene in the face of misconduct; nor did they report the misconduct of their fellow officers or receive any punishment for having failed to do so. Consequently, the acts of police officers in which they use excessive force, engage in racial profiling, making or file false arrests and reports, make warrantless entry into citizens' homes, etc., are condoned by other offices present, their supervisors, precinct commanders, including Deputy Inspect Steven Ortiz and the NYPD Commissioner Kelly.

(99)    The City's and/or NYPD tolerance for brutality, excessive force, illegal and/or retaliatory arrests, and their emphasis to "come down hard on quality of life infractions", leads to a systemic practice and policy wherein City officials seem fairly tolerant, both outwardly and inwardly of police brutality, silence in the face of brutality and/or illegal stops, frisks, searches, seizures and/or arrests, warrantless entry into citizens' homes and engage in arrest quotas.  A systemic practice where officers who report said misconduct are not viewed as "good cops", but rather as outcasts and snitches and are isolated, ostracized and often transferred, thereby perpetuating the illegal conduct of the officers.

(100)   Some instances where officers were treated as outcasts for reporting misconduct and/or an arrest/summons quota system are as follows:

        a.    the existence of arrest quotas, summons quotas and approval of illegal stops and arrests have been exposed by Police Officer Adrian Schoolcraft in a separate lawsuit which was cited by Justice Scheindlin, in David Floyd et al v. The City of New York, 08 Civ 1034.

        b.    Justice Scheindlin cited the deposition of Police Officer Adhyl Polanco of the 41st precinct, stating that commanding officers set specific quotas for arrests

and summons and for stop and frisks (UF-250's), and threatened to reduce overtime for officers who failed to perform well and to reassign those who fail to meet quotas to less desirable posts.

c. According to secretly taped recorded conversations made by Schoolcraft, a Lieutenant, a Deputy Inspector and a Chief of the Division of Transportation all can be heard encouraging/demanding increased stops, summons, detentions and/or arrests.

d. Police Officer Craig Matthews of the 42nd precinct filed a lawsuit against the NYPD claiming the existence of a quota system and a systematic retaliation and harassment to those who did not comply.

e. Recently, retired Detective James Griffin, filed a lawsuit claiming that in the NYPD there exists a culture wherein officers who report corruption, face harassment and a hostile work environment and this conduct was tolerated by supervisors within the NYPD.

(101)   Upon information and belief, arrest quotas and summons quotas, often couched by the defendants as "performance standards", are ingrained as a part of a NYPD officer's job, leading to shortcuts and violations of citizen's constitutional rights to meet those so called performance levels.

(102)   In the matter of Dominguez v. City of New York, a lawsuit pending in Bronx Supreme Court under Index #305140-2011, a named defendant, Sgt. Karl Kindred of the Bronx Narcotics Division and a supervisor, stated under oath on April 19, 2013 at his deposition, see P. 32-37, that "all individuals who were merely present in an apartment would be arrested if it was pursuant to a search warrant", which clearly is not the law.

(103)   Further evidence of a pattern, policy or custom is evidenced by a recent New York Daily News article dated May 19, 2013, documenting rampant police abuse where the officers involved were not disciplined in any meaningful manner but rather prompted to a higher position.

33

WHEREFORE, Plaintiff(s) demand(s) judgment against the Defendants herein, in a sum exceeding the jurisdictional limits of all lower courts which would otherwise have jurisdiction, together with the costs and disbursements of this action.

Dated:      Bronx, New York
February ___, 2014

Yours, etc.

MICHAEL BRAVERMAN
GETZ & BRAVERMAN, P.C.
Attorneys for Plaintiff(s)
LIONELL WILLIAMS
172 East 161st Street
Bronx, New York 10451
(718) 993-3000
Our File No. 8703

34

PLAINTIFF'S VERIFICATION

STATE OF NEW YORK )
                     SS:
COUNTY OF BRONX    )

*Lionell Williams*, being duly sworn, deposes and says:

I am the PLAINTIFF in the within action. I have read the foregoing *Summons &*
*Complaint*
and know the contents thereof and the same is true to my own knowledge, except as to those

matters stated upon information and belief and as to the matters I believe them to be true.

Sworn before me this

7th day of *February*, 2014

NOTARY PUBLIC

MICHAEL IRA BRAVERMAN
NOTARY PUBLIC, STATE OF NEW YORK
BRONX COUNTY 02BR6035120
Certificate Filed in
Bronx County
Commission Expires 12-27-2016

Index No.
SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
_____

LIONELL WILLIAMS,

                              Plaintiff(s),

                    - against -

THE CITY OF NEW YORK, COMMISSIONER
RAYMOND KELLY IN HIS OFFICIAL CAPACITY,
P.O. JOHN DOE #1, BADGE #: 25511, P.O. JANE DOE #2,
BADGE # 12414 AND BEST BUY,

                              Defendant(s).
_____

_____

### VERIFIED SUMMONS AND COMPLAINT

_____

## GETZ & BRAVERMAN, P.C.
*Attorneys for LIONELL WILLIAMS*
**172 East 161st Street
Bronx, New York 10451
(718) 993-3000**

_____

TO: